W. S. LAY v. THE RICHMOND AND DANVILLE RAILROAD CO.

*Damages—Contributory Negligence—Proximate Cause—Judge's Charge—Trespass—Crossing.*

1. In an action against a railroad for injury of a horse, plaintiff showed that the horse had fallen on defendant's track at a foot-crossing on account of getting his foot hung by a defectively driven spike, and that before he could get him off he was struck by defendant's dump-car, in charge of its agents, who were called on to stop more than a hundred yards away, the Court charged the jury that though the plaintiff may have been negligent in entering defendant's tract, said negligence was not the approximate cause of the injury complained of, and they should respond to the second issue, No: *Held* to be error.

2. The issue of contributory negligence ought not to have been withdrawn from the jury. For aught that appears, the plaintiff might have had reason to apprehend injury to his horse at that place, and, if so, it was negligence to take him over it.

3. The trespass, if admitted, does not prevent a recovery if defendant, by ordinary care, could have avoided the injury.

4. When the question of contributory negligence arises at all, the better practice is to submit a separate issue upon it.

This was a CIVIL ACTION, tried at Spring Term, 1890, of the Superior Court of GASTON County, before *Philips, J.*

The plaintiff demanded $200 for injuries to a horse, which he alleged was injured by the negligence of the

defendant, and which was denied by the defendant, as set out in the pleadings, all of which, with the issues submitted to the jury, appear in record.

Plaintiff offered himself as a witness, and swore: "In November, 1887, I was riding my horse across defendant's railroad track. When he reached the last rail in the direction in which I was going, he set his foot down so as to catch the toe of the shoe between the rail and the spike driven there for the purpose of holding the rail down. This spike was not driven home   I could put my hand between it and the tie. The horse got hung in this way, and fell over on the outside of the track, his body being on the outside, and his foot caught, as described, on the inside of the track. I went to the house of my brother (Rufus Lay) to get him to help me get the horse up. This was about one and a half miles from Gastonia, in the direction of Charlotte. My brother and I tried to pull the horse up so as to loose him, but could not. I heard the dump coming from towards Charlotte. My brother ran thirteen or fourteen yards beyond a private crossing, about ninety-seven yards from the horse, towards the dump. I myself ran about thirty yards in the direction the dump was coming; then I had to get off the track, out of the way of the dump. I said, 'Men, do not run over my horse,' and beckoned to them to stop. Baber, the section-master, and six hands were on the dump. I hallooed, 'Men, for God sake, don't run over my horse!' After the dump ran over the horse, he got up. The dump ran about fifteen yards and stopped. I heard brother ahead of me hallooing at them. He ran up the railroad and hallooed, 'Stop! a horse is on the track.' They made no check until they ran over the horse. They were running at high speed. The track was level for a quarter of a mile where the horse was. They could have stopped from where Rufus met them, and could have stopped from where I was before they got to the horse. They made no attempt to stop. I was traveling a private road that crossed the railroad.

This road had been used as a private way ever since I was a boy, thirty years or more before the railroad was ever built, and has been kept up across the railroad since it was built. I could run my hand under the spike. The horse caught his shoe between the spike and the rail. The wheels mashed the bones and cut the leaders. I kept him from November until the next August. I let Clemmer have him and he died. He could not do a day's work after the accident. I did all I could to cure him. He had been a good horse and I did not want to kill him. John Craig told me to kill him. Craig was a man of large experience with horses. I had the horse in the stable for four months. He was worth, at the time of the accident, $100. After he got hurt he was not worth anything—a dead expense. I got an old mule for him, and he died. The horse cost me at least $50 in board and attendance. The mule I got for him was worth $5. I did not want to kill my horse, and I got the mule to get clear of the horse."

*Cross-examined.*—"Lovell is the first station out from Gastonia. The dump was coming from Lovell, going into Gastonia. It was dusky-dark, after sundown. There was no bridge across the road where my horse fell. There was a bridge at a private crossing about sixty-five yards from there, but the railroad had never built a bridge at the place where my horse got hung The place where I was crossing was a foot-path, and there had never been any bridge across the road there. The horse's foot was caught between the spike and the rail. The horse fell over outside of the track into the ditch. The horse was not down more than ten or fifteen minutes. The dump ran ten or fifteen steps beyond the horse and then stopped. All of them got off it and looked at the horse. I tried to work the horse in the summer, but his foot was turned up so I could not."

*Re-direct.*—"The road was straight from where Rufus was to the horse. You could see up the road."

Here plaintiff rested.

The defendant offered in evidence—

1. The date of the summons in this cause, dated 4th August, 1888.

2. The complaint, showing the accident in November, 1887.

James Baber: "I was on the dump-car; we were running fast, twelve or fourteen miles an hour, trying to get into Gastonia before the freight train pulled out from there for Charlotte. It was dark when the horse was struck; was about fifty yards from the crossing. I knew this, because I counted the rails. It was five rails from the crossing, and the rails are thirty feet long. The first man I saw was about that crossing, and he was hollering, 'Stop!' This was Rufus Lay. I had been hollered at to stop so much by people who wanted to get a ride that I paid no attention. It was down grade from the bridge to the horse. We were running twelve or fourteen miles an hour. Next I saw W. S. Lay, who was hollering also, and we then put on the brakes. We thought something was the matter when we saw the second man. I was then employed on the road. I am not now. I have been off about eighteen months."

*Cross-examined.*—"My brother, Jack Baber, was the boss, and he ordered the brakes on. Bob Quinn was at the brake, Jack Baber whistled for the brakes to be put on. I do not know that I had seen the horse until I was on it. I heard the whistle before we rolled over the horse. I never was stopped by Rufe or W. S. Lay before. I had been on the road about eighteen months. I did not see the first man we passed, and did not know W. S. Lay until we had passed him. I was acquainted with both of them."

*Re-direct.*—"Jack Baber had been on the road about two years."

John Baldwin swore that he was also on the dump, and told about the same story as Baber, and that he had been off the road about eighteen months.

Bob Quinn was also on the dump, and swore about the same as Baber and Baldwin, and said further that he had " never been waved down by Rufus Lay before, but had been waved down by W. S. Lay; he waved us down to get a ride, and Baber made him get off "

Defendant closed.

Plaintiff then offered Rufus Lay, a brother of plaintiff, who swore as follows: " I met the dump ninety-seven steps from where the horse was lying; it was thirty-two steps beyond the bridge. The horse was sixty-five steps from the bridge. I ran and hollered to Baber that a horse was hung on the track. It was in two hundred yards of my house. I hollered at the top of my voice and waved both hands, and said, ' Mr. Baber, a horse is hung on the track; don't run over him.' I hollered loud enough to be heard half a mile. W. S. Lay and I tried to get the horse off the track. I was at the horse when I heard the dump coming. I was in front of my brother, and did not see him signal to stop."

The defendant, among other prayers for instructions, asked the following:

1. Defendant owed no duty to plaintiff or to the public to erect and maintain a crossing that would be safe for horse-back travellers at the point where plaintiff says he attempted to cross its track.

This prayer was given.

2. Therefore, in attempting to cross the track where he did, plaintiff was a mere trespasser, and took upon himself all the risks incident to such attempt, and defendant is not liable for any injury caused by the fall of the horse.

The Court gave this charge, but added to it, " But the defendant would be liable for any injury caused to the horse after it had fallen, if it could have been avoided by ordinary care."

3. If the jury believe from the evidence that the horse was necessarily injured by the fall, plaintiff could not recover,

because he has offered no evidence as to the extent of such injury, nor as to the value of the horse after the fall and before he was run over by the dump.

This prayer was refused.

4. Defendant is entitled to nothing for the keeping and doctoring his horse, when he shows, by his own evidence, that the advice of Veterinary Surgeon Craig, to whom he applied for advice, was to shoot the horse at once.

This prayer was refused.

(The remainder of the charge is incorporated in the opinion of the Court.)

Defendant excepted to this charge.

The jury returned a verdict as set out in the record.

Defendant moved for a new trial. Motion denied. Appeal by defendant.

No counsel for plaintiff.
*Mr. G. F. Bason*, for defendant.

AVERY, J.—after stating the facts: The Judge closed his charge to the jury in the following words: "The Court further charges the jury that the burden of showing contributory negligence is on the defendant, and, before the jury can find the second issue in the affirmative, they must be satisfied that the negligence of the plaintiff was the proximate cause of the injury complained of; and the Court instructs the jury, upon the evidence in this case, that, though the plaintiff may have been negligent in entering upon the track of the defendant, said negligence was not the approximate cause of the injury complained of, and the second issue should be answered, No."

There was error in withdrawing the issue involving contributory negligence from the jury, or telling them to respond to it, "No." If the plaintiff attempted to ride a horse across the track at a point other than a crossing, and the condition

of the road at the place was such· that he had any reason to apprehend injury to the animal in the attempt to pass over, it was negligence to take it upon the road at all. We have no *data* upon which to form an opinion other than the fact that the horse was actually injured, and we could not safely determine the question of negligence solely from the fact of injury ensuing. Nor do we concede the soundness of the position that the plaintiff could not, in any event, recover, because he was a trespasser in attempting to pass at a place other than a crossing. If the facts in reference to the safety of the point selected as a pass-way were in dispute, the jury should have been left to respond, with suitable instruction, to the second issue. 2 Wood's R. L., § 418, p. 1550.

The trespass, if admitted, does not prevent a recovery, if the defendant, by ordinary care, could have avoided the injury. 3 Wood's R. L, § 417, p. 1546, note 137; *State* v. *Bullock* (decided at this term).

While it was not essential that there should have been another issue, this case illustrates the importance of adopting the suggestion of this Court in *McAdoo* v. *Railroad*, 105 N. C., 140, of submitting to the jury by a separate issue, where it arises, the question, whether the defendant, notwithstanding the contributory negligence of the plaintiff, could, by the exercise of ordinary care, have avoided the injury. In instructing the jury as to such an issue, some of the points discussed in the case of *Bullock* v. *Railroad*, 105 N. C., 180, would necessarily arise, but were not referred to by his Honor except in stating, in a previous part of his charge, the abstract principle. If the jury had found, in response to another issue, that, notwithstanding plaintiff's negligence, the defendant could have avoided the injury by the exercise of ordinary care, the finding of the second issue would have been immaterial. The Judge, in effect, however, decided upon the evidence that the negligence of the plaintiff was not, but that of the defendant was, the proximate

cause of the injury, without leaving the jury to determine whether the defendant, after he ascertained or had reason to believe, or, by proper watchfulness, might have discovered that the horse was fastened upon the track, could, by the use of the appliances at his command, have avoided running his dump-car over it. He might have submitted such instruction and applied it to the first issue, but more clearly and readily to an additional one, such as we have suggested.

There was error, for which a new trial must be granted.

Error.